**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **APRIL R. MURRAY SHEARER,** | : | **Civil No.  1:21-CV-398** |
| **O/B/O J.K.M.** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **v.** | : | |
| | : | |
| **KILOLO KIJAKAZI,** | : | |
| **Acting Commissioner of Social Security,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM OPINION

### I.    Introduction

The Supreme Court has underscored for us the limited scope of our

substantive review when considering Social Security appeals, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S. Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S. Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S. Ct. 206. See Dickinson v.

1

Zurko, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

April Shearer applied for supplemental security income under Title XVI of the Social Security Act on behalf of her minor son, J.K.M., on May 19, 2017, alleging an onset date of disability of May 3, 2005. J.K.M. had previously been awarded benefits, but in 2014, on reconsideration, an Administrative Law Judge ("ALJ") determined that J.K.M. was no longer disabled as of January 31, 2014. Thus, a hearing was held before an ALJ regarding this new application for benefits. On this occasion the ALJ found that J.K.M. was not disabled and denied the application for benefits. Shearer now appeals this decision, arguing that the ALJ's decision is not supported by substantial evidence.

However, after a review of the record, and mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" Biestek, 139 S. Ct. at 1154, we find that substantial evidence supported the ALJ's findings in this case. Therefore, for the reasons set forth below, we will affirm the decision of the Commissioner.

II.   <u>**Statement of Facts and of the Case**</u>

April Shearer filed for SSI on behalf of her minor son, J.K.M., on May 19, 2017, alleging that J.K.M. was disabled due to panhypopituitarism, ectopic pituitarism, hypoglycemia, hypothyroidism, life threatening cortisol deficiency, and high functioning autism. (Tr. 121). She alleged that her son was disabled since May 3, 2005, shortly after he was born. (<u>Id.</u>) At the time of the most recent disability determination, J.K.M. was fourteen years old and was in ninth grade.

As we have noted, in 2009, J.K.M. was found to be disabled due to his panhypopituitarism. (Tr. 91). At that time, an ALJ found that J.K.M. had an extreme limitation in the domain of health and physical well-being. (Tr. 92). However, on reconsideration in a decision dated April 20, 2017, an ALJ found that as of January 31, 2014, J.K.M was no longer disabled, reasoning that J.K.M. had less than marked limitations in five of the six domains of functioning, and no limitation in the domain of moving about and manipulating objects. (Tr. 104-06).

J.K.M. suffered from panhypopituitarism[1] since he was an infant, for which he was prescribed a daily growth hormone. (Tr. 790). In January of 2015, treatment notes from Penn State Health at the Hershey Medical Center indicated that J.K.M.

---

[1] Panhypopituitarism is a rare condition in which the production and secretion of all hormones by the pituitary gland is reduced. See https://www.chop.edu/conditions-diseases/panhypopituitarism-children (last visited November 10, 2022).

would be treated for this condition for the rest of his life. (Tr. 881). It was also noted that J.K.M. had a history of high functioning autism and was on several medications which had been stable for the past two years. (Id.) These treatment notes also indicated that J.K.M. used Benadryl to help him sleep, which he tolerated well. (Id.) At a visit in December of 2015, it was noted that J.K.M. had grown 3.4 centimeters and had gained 9 kilograms in weight, and that he experienced no adverse side effects from his medications. (Tr. 845).

At a follow up appoint in July of 2016, it was noted that while J.K.M. had sixty hospitalizations since birth, he had not had any hospitalizations in two years. (Tr. 826). J.K.M.'s diagnoses were listed as autism spectrum disorder, childhood obesity, combined hyperlipidemia, and panhypopituitarism. (Tr. 829-30). At this time, he also had an x-ray of his spine, which revealed no significant scoliotic curvature of his spine. (Tr. 823). At a follow up with endocrinology in July, it was noted that J.K.M. had been doing well since his last visit. (Tr. 815). A physical examination revealed largely normal findings. (Tr. 817).

At a visit to Hershey Medical Center in January of 2017, it was noted that J.K.M.'s mother was happy with his growth. (Tr. 801). At this time, treatment records stated that his "endocrine conditions [were] well managed" and his medications remained the same. (Tr. 804). A bone study was performed, which

4

indicated normal bone age with discordant delay in maturation of the carpal bones. (Tr. 799). It was noted that J.K.M.'s bone age "correspond[ed] to the standard of an 11-year 6-month-old male," and this represented normal bone age. (Id.) At a follow up endocrinology visit in June of 2017, it was noted that J.K.M. was doing well, and there were no changes made to his medications. (Tr. 1095, 1098).

J.K.M. had his yearly examination in July of 2017, during which it was noted that he had started testosterone replacement therapy. (Tr. 1070). It was also noted that he had not done well in sixth grade, but that his school was attempting to provide him with additional support. (Id.) Treatment notes indicate a problem with insomnia, but noted that J.K.M. took Benadryl, Melatonin, and Clonidine which worked well. (Id.)

In June of 2018, J.K.M. presented to the emergency department at Hershey Medical with complaints of respiratory problems. (Tr. 1294). His mother stated that he had nosebleeds everyday for 4-5 days, and that he had 3 nosebleeds the day he presented to the emergency room. (Id.) These episodes were preceded by an incident in March in which J.K.M. fell out of his bed and struck the left side of his face. (Tr. 1319). An ENT was consulted in the emergency department, and J.K.M. was discharged as stable. (Tr. 1300). J.K.M. saw an ENT again at an endocrinology visit in June of 2018, during which time it was noted that J.K.M. was growing 12.6

centimeters per year, which was deemed "an excellent rate of growth." (Tr. 1287).
A bone scan revealed normal bone age. (Tr. 1266). Regarding his nosebleeds, it was
determined that moisture care was needed in order for J.K.M.'s nose to be healthy.
(Tr. 1274). At a follow up in July, it was noted that J.K.M. was having fewer nasal
issues and only had one minor nosebleed since his last visit. (Tr. 1262). At a
December 2018 endocrinology follow up, it was noted that J.K.M. was doing well.
(Tr. 1202).

In February of 2019, J.K.M. was seen at the emergency department for
complaints of abdominal pain. (Tr. 1158). It was noted that he was unable to tolerate
his at-home stress dose steroids. (Id.) He was admitted to the emergency department,
and on discharge he was stable, and his hypoglycemia and hypotension had
completely resolved. (Tr. 1159). At a follow up appointment, it was noted that
J.K.M. was recovering nicely, and that we would be monitored at home until he
could return to school on February 18. (Tr. 1141).

During the relevant time, J.K.M. was also treated for several mental
impairments. Treatment notes from Philhaven in January of 2017 indicate that
J.K.M. suffered from attention deficit hyperactivity disorder ("ADHD"), autism
spectrum disorder, unspecified anxiety disorder, and unspecified depressive
disorder. (Tr. 1581). His treatment plan indicated that he had problems throwing

6

tantrums when he did not get his way at home. (Tr. 1583). In February 2017, it was noted that J.K.M.'s behavior was improving, but he had been downloading pornographic materials on his parents' electronics. (Tr. 1872). However, in March, J.K.M.'s mother reported that he had become more defiant and less expressive. (Tr. 1869). His parents believed his behavior and increased aggression to be due to his medication changes. (Tr. 1867).

Treatment notes from Philhaven in August of 2017 indicated that J.K.M. was focusing on decreasing his noncompliant behavior and becoming accountable. (Tr. 1849). In November, J.K.M. was noted to be verbally aggressive and have mood swings, but that he was focusing on increasing his motivation and decreasing his verbally aggressive behavior. (Tr. 1836-37). Treatment notes indicate that J.K.M. was making minimal to moderate progress through April of 2018, although he expressed some concerns regarding the support he was receiving at school. (Tr. 1812-31).

However, in August of 2018, J.K.M. was voluntarily admitted to an inpatient program at Philhaven after he presented to the emergency room with suicidal and homicidal threats and temper outbursts. (Tr. 1739). It appeared this outburst was predicated on J.K.M.'s mother disciplining him and taking away his toys and computer. (Id.) It was noted that J.K.M. had a history of threatening his mother, and

7

that his younger sister was scared of him. (Id.) During his inpatient admission, J.K.M. was provided with therapies and medication adjustments, and upon discharge, his condition was stable, he had a euthymic mood and normal thought content, and he had no suicidal or homicidal ideations. (Tr. 1740). It was recommended that he receive outpatient therapy weekly. (Tr. 1471).

J.K.M. continued outpatient therapy with Philhaven. Treatment notes indicate that J.K.M. still struggled to maintain his anger when his computer or phone was taken from him, as he was continuing to download or watch pornographic materials. (Tr. 1785, 1795). However, treatment notes through January of 2019 indicated that J.K.M. was making moderate progress toward his goals. (Tr. 1774-84). In April of 2019, it was noted that J.K.M. was focusing on following through with a daily hygiene routine. (Tr. 1629). In May, treatment notes indicate that J.K.M. was making an effort at home and at school to make positive choices. (Tr. 1637). A progress note from June of 2019 noted that J.K.M. was focusing on organization, compliance, and responsibility regarding his job and managing money. (Tr. 1643). Indeed, J.K.M.'s mother testified at the hearing that he held a job at Hershey Park as a sweeper in 2019. (Tr. 73-74). However, she stated that after J.K.M. left that job, "[h]e sa[id] he doesn't ever want to work again." (Tr. 74).

Progress notes through October of 2019 were largely unremarkable, noting moderate progress. (Tr. 1926-36). On examination in January of 2020, J.K.M.'s speech and thought processes were normal, he was cooperative, he had appropriate affect, and he had no homicidal ideation. (Tr. 1946-47). However, J.K.M. was admitted to Philhaven's partial hospitalization program in March of 2020 due to increasing anger and aggressive behavior. (Tr. 33).

The record also indicates that following the ALJ's decision in this case, J.K.M. was involuntarily hospitalized after he made threats to family members. (Tr. 26). His mother reported that he gets angry easily and would yell and hit his little sister. (Id.) J.K.M. reported that he did not like having to participate in group therapy via Zoom due to the Covid-19 pandemic, and that the pandemic was a stressor for him. (Tr. 28).

In addition to these medical challenges that J.K.M. faced, he was also placed on an Individualized Education Plan ("IEP") at school in order for him to have more support in the educational setting. (Tr. 364-546, 927-1038). While he was in 7th grade, he was enrolled in several regular courses with supports provided by the special education staff. (Tr. 455). This IEP also noted that J.K.M. had received speech services from the time he entered kindergarten. (Id.) It was noted that areas of improvement included math, social skills, and written expression. (Tr. 466).

J.K.M. received supplemental support, which allowed for extra support provided by special education personnel for more than 20% but less than 80% of the school day. (Tr. 485).

J.K.M.'s 8th grade IEP noted that he had been receiving Occupational Therapy but was being dismissed at that time due to his success with the program. (Tr. 419, 422). It was noted that he adjusted well to 8th grade, that he was polite to his teachers and followed directions in class. (Tr. 421). J.K.M. had participated in extracurricular activities by becoming the manager of the football team. (Tr. 422). He continued to have additional support from special education staff throughout the school day, and it was noted that it had been beneficial for him. (Tr. 444).

In J.K.M.'s 9th grade IEP, it was noted that he received English, Reading, and Math instruction in the learning support setting, and he received the rest of his education in the general setting, in addition to two periods of academic support per day. (Tr. 373). One teacher noted that J.K.M. was appropriate in his attitude and got along with peers and teachers, and he was able to do work in a group setting. (Tr. 376). It was further noted that he was making appropriate progress toward his IEP goals. (Tr. 379). It was reported that J.K.M. had difficulties completing his work, but that a teacher worked with him and his mother to create a system to help keep

him up to date on his assignments. (Tr. 382). The IEP notes that J.K.M. was good with computers, but that he did not like homework and socializing. (Tr. 386).

In April of 2019, Kristen Thomas-Derr, J.K.M.'s special education teacher, filled out a Teacher Questionnaire. (Tr. 268-75). She noted that J.K.M. was receiving special education services, and that his actual grade level was 8th grade. (Tr. 268). In the area of acquiring and using information, she reported an obvious problem with reading comprehension, math, expressing ideas in written form, and applying problem solving skills, but no serious or very serious problems. (Tr. 269). In the area of attending and completing tasks, Ms. Derr noted obvious problems in completing assignments and completing work accurately without careless mistakes, reporting that J.K.M. would rush through assignments just to be finished. (Tr. 270). In interacting and relating with others, Ms. Derr reported obvious problems with making and keeping friends, seeking attention appropriately, and expressing anger appropriately, noting that J.K.M.'s social skills were below grade level expectation. (Tr. 271). She noted no problems in moving about and manipulating objects. (Tr. 272). Finally, in the area of caring for himself, Ms. Derr reported a very serious problem with J.K.M.'s personal hygiene, and serious problems with knowing when to ask for help and using appropriate coping skills. (Tr. 273).

11

Ms. Derr filled out a second Teacher Questionnaire in August of 2019. (Tr. 321-28). In this questionnaire, Ms. Derr reported only slight problems in the area of acquiring and using information. (Tr. 322). In the area of attending and completing tasks, Ms. Derr noted serious problems with organizing things and completing assignments. (Tr. 323). In interacting and relating with others, Ms. Derr again noted obvious problems in making and keeping friends, seeking attention appropriately, expressing anger appropriately, and interpreting facial expressions. (Tr. 324). Similarly, Ms. Derr again noted a very serious problem with personal hygiene. (Tr. 326).

It was against this backdrop that the ALJ issued a decision on April 3, 2020, denying Shearer's application for SSI on behalf of J.K.M. (Tr. 40-49). The ALJ employed the three-step evaluation process to determine whether a child is eligible for SSI payments by reason of disability. As part of this analysis the ALJ must sequentially determine: (1) whether the child is engaged in substantial gainful activity; (2) whether the child has a medically determinable, severe impairment; (3) whether the child's impairment or combination of impairments meets, medically equals, or functionally equals an impairment listed in part B of 20 C.F.R. Part 404, Subpart P, Appendix 1. See 20 C.F.R. § 416.924.

In this decision, the ALJ first concluded that J.K.M. had not engaged in substantial gainful activity since May 19, 2017, the application date. (Tr. 41). At Step 2 of the sequential analysis, the ALJ found that J.K.M. had the following severe impairments: panhypopituitarism, obesity, attention deficit hyperactivity disorder ("ADHD"), autism, generalized anxiety disorder, and mood dysregulation disorder. (Id.) At Step 3 the ALJ determined that the claimant did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. (Tr. 41-42). The ALJ explained that in order to meet a listing, a claimant must have either an extreme limitation in one area of functioning, or a marked limitation in at least two areas of functioning. (Tr. 42). The ALJ specifically considered Listings 112.11, 112.10, 112.06, and 112.04, and determined the mental health impairments J.K.M. was diagnosed with did not meet these listings. (Id.) Rather, the ALJ found that J.K.M. had only moderate limitations in understanding, remembering, or applying information; interacting and relating with others; and concentrating, persisting, and maintaining pace, as well as mild limitations in adapting or managing himself. (Id.)

Next, the ALJ determined the issue of functional equivalence to a listing by assessing J.K.M.'s degree of impairment in six domains of functioning: (1) Acquiring and Using Information; (2) Attending and Completing Tasks; (3)

Interacting and Relating with Others; (4) Moving about and Manipulating Objects; (5) Caring for Yourself; and (6) Health and Physical Well-Being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). (Tr. 18-22). Under this functional equivalence analysis, if the ALJ found that J.K.M. exhibited either a "marked" limitation in two of these six domains, or an "extreme" limitation in any single domain, he would be deemed disabled. 20 C.F.R. § 416.926a(d).

Guided by this analytical paradigm, the ALJ found that J.K.M. suffered from no extreme or marked impairments and determined that he had no limitation in moving about and manipulating objects, and only experienced less than marked impairments in the remaining domains of functioning. (Tr. 43-48). The ALJ considered the entirety of the medical record, which included medical opinion evidence. On this score, the ALJ considered the opinions of several state agency psychological and medical consultants and found these opinions persuasive. (Tr. 48). The ALJ noted throughout the analysis that the less than marked limitations in each area of functioning were supported by these state agency opinions. (Tr. 46-48).

The ALJ also considered the testimony of J.K.M. and his mother, Ms. Shearer. (Tr. 43-48). Ms. Shearer testified that she was unsure if J.K.M.'s daily activities were limited by his impairments; that J.K.M. was limited in his ability to take care of his personal needs, particularly his hygiene; that he did not have much energy and

14

suffered from insomnia; that J.K.M. had behavioral issues which included threatening her at times; that he refused to do his homework and that he needed to be redirected often; and that J.K.M. did not have to repeat any grades in school. (Tr. 44-45). J.K.M. testified that his favorite thing about school was seeing his friends; that he used to work at Hershey Park but does not anymore because it was stressful; that he did not like school; and that he was attending a program during the school day that he liked. (Tr. 45).

However, the ALJ found that this testimony was not supported by the medical records, the Teacher Questionnaires, or the state agency consulting opinions, all of which indicated J.K.M. had a less than marked limitation in all areas of functioning. (Tr. 45-48). Based upon these findings the ALJ concluded that J.K.M. did not satisfy the juvenile disability criteria under the Act since he did not display marked impairments in at least two domains of functioning and denied this claim. (Id.)

This appeal followed. (Doc. 1). On appeal, the plaintiff contends that the ALJ committed multiple errors in evaluating whether J.K.M.'s severe impairments met or functionally equaled a listing. Additionally, the plaintiff argues that the ALJ failed to consider J.K.M.'s other impairments as severe, and that the ALJ erred in relying on the opinion of the state agency consultant rather than the teacher questionnaires.

This matter has been fully briefed by the parties and is now ripe for resolution. (Docs. 10, 17). As discussed in greater detail below, having considered the arguments of counsel and carefully reviewed the record, we will affirm the decision of the Commissioner denying this claim.

## III.   Discussion

### A.   Child Disability Claims: Initial Burdens of Proof, Persuasion and Articulation for the ALJ

The legal standards which govern an ALJ's consideration of a childhood disability claim under the Act are familiar ones.

The Social Security Act provides that in order to qualify for disability benefits, a child must have "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(I). The Commissioner has interpreted this statutory provision in regulations which provide that a child whose condition meets, medically equals, or functionally equals the criteria of a listed impairment must be found disabled. Similarly, a child whose impairment(s) do not meet or equal (medically or functionally) the listing criteria contained in 20 C.F.R. Part 404, Subpart P, Appendix 1 is not disabled. 20 C.F.R. § 416.924(a).

Under these regulations, when determining the issue of functional equivalence to a listed impairment, there are six domains of functioning which an ALJ must consider: (1) Acquiring and Using Information; (2) Attending and Completing Tasks; (3) Interacting and Relating with Others; (4) Moving about and Manipulating Objects; (5) Caring for Yourself; and (6) Health and Physical Well-Being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). In order to establish a disabling level of functional equivalence to a listed impairment, an ALJ must conclude that a child exhibits either a "marked" limitation in two of these six domains, or an "extreme" limitation in any single domain. 20 C.F.R. § 416.926a(d). The Commissioner defines a "marked" limitation as one which:

> interferes seriously with your ability to independently initiate, sustain, or complete activities. Your day-today functioning may be seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. 'Marked' limitation also means a limitation that is 'more than moderate' but 'less than extreme.' It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.

20 C.F.R. § 416.926a(e)(2).

The Commissioner then defines an "extreme" limitation as one which:

> interferes very seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be very seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. 'Extreme' limitation also means a limitation that

is 'more than marked.' 'Extreme' limitation is the rating we give to the worst limitations. However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean.

20 C.F.R. § 416.926a(e)(3).

### B.   Substantial Evidence Review – the Role of this Court

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); J.K.M.son v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F.Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two

inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that [she] is not disabled is

supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); Burton v. Schweiker, 512 F.Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts"); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F.Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision."

20

Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the

Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for
> his decision. 220 F.3d at 119. Conclusory statements . . . are
> insufficient. The ALJ must provide a "discussion of the evidence" and
> an "explanation of reasoning" for his conclusion sufficient to enable
> meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d
> 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ
> particular "magic" words: "Burnett does not require the ALJ to use
> particular language or adhere to a particular format in conducting his
> analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the

ALJ's decision under a deferential standard of review, but we must also give that

decision careful scrutiny to ensure that the rationale for the ALJ's actions is

sufficiently articulated to permit meaningful judicial review.

### C.    Legal Benchmarks Governing Step 3 of This Sequential Analysis

This dichotomy between the Act's deferential standard of review and

caselaw's requirement that ALJs sufficiently articulate their findings to permit

meaningful judicial review is particularly acute at Step 3 of this disability evaluation

process. At Step 3 of this sequential analysis, the ALJ is required to determine

whether, singly or in combination, a claimant's ailments and impairments are so

severe that they are *per se* disabling and entitle the claimant to benefits. As part of

21

this Step 3 disability evaluation process, the ALJ must determine whether a claimant's alleged impairment is equivalent to a number of listed impairments, commonly referred to as listings, that are acknowledged as so severe as to preclude substantial gainful activity.  20 C.F.R. § 416.920(a)(4)(iii); 20 C.F.R. pt. 404, subpt. P, App. 1; Burnett, 220 F.3d 112, 119.

In making this determination, the ALJ is guided by several basic principles set forth by the social security regulations and case law. First, if a claimant's impairment meets or equals one of the listed impairments, the claimant is considered disabled *per se* and is awarded benefits. 20 C.F.R. §416.920(d); Burnett, 220 F.3d at 119. However, to qualify for benefits by showing that an impairment, or combination of impairments, is equivalent to a listed impairment, a plaintiff bears the burden of presenting "medical findings equivalent in severity to *all* the criteria for the one most similar impairment." Sullivan v. Zebley, 493 U.S. 521, 531 (1990) (citing 20 C.F.R. §416.920(d); SSR 83-19 at 91). An impairment, no matter how severe, that meets or equals only some of the criteria for a listed impairment is not sufficient. Id.

The determination of whether a claimant meets or equals a listing is a medical one. To be found disabled under Step 3, a claimant must present medical evidence or a medical opinion that his or her impairment meets or equals a listing. An ALJ is

not required to accept a physician's opinion when that opinion is not supported by the objective medical evidence in the record. <u>Maddox v. Heckler</u>, 619 F.Supp. 930, 935-936 (D.C. Okl. 1984); Carolyn A. Kubitschek & Jon C. Dubin, Social Security Disability Law and Procedure in Federal Courts, § 3:22 (2014). However, it is the responsibility of the ALJ to identify the relevant listed impairments, because it is "the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." <u>Burnett</u>, 220 F.3d at 120 n.2.

On this score, however, it is also clearly established that the ALJ's treatment of this issue must go beyond a summary conclusion, since a bare conclusion "is beyond meaningful judicial review." <u>Burnett</u>, 220 F.3d at 119. Thus, case law "does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis. Rather, the function . . .  is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review." <u>Jones</u>, 364 F.3d at 505. This goal is met when the ALJ's decision, "read as a whole," <u>id.</u>, permits a meaningful review of the ALJ's Step 3 analysis. However, when "the ALJ's conclusory statement [at Step 3] is . . . beyond meaningful judicial review," a remand is required to adequately articulate the reasons for rejecting the claim at this potentially outcome-determinative stage. <u>Burnett</u>, 220 F.3d at 119.

D. __The ALJ's Decision is Supported by Substantial Evidence.__

In this setting, we are mindful that we are not free to substitute our independent assessment of the evidence for the ALJ's determinations. Rather, we must simply ascertain whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, Richardson, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence," Pierce, 487 U.S. at 565, but rather "means— and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Biestek, 139 S. Ct. at 1154. Judged against these deferential standards of review, we find that substantial evidence supported the ALJ's decision that J.K.M. was not entirely disabled.

The plaintiff contends that the ALJ erred in failing to consider J.K.M.'s limitations, both from the impairments found to be severe as well as other impairments. On this score, the plaintiff asserts that the ALJ failed to consider the following impairments which the plaintiff claims are severe and impact J.K.M.'s daily functions: insomnia, hypersomnia, oppositional defiant disorder, obsessive compulsive disorder, Asperger's Syndrome, and learning disorder. The plaintiff further asserts that the ALJ's reliance on the four state agency consulting opinions, rather than on the Teacher Questionnaires, was in error. However, after a review of

the record, we conclude that the ALJ adequately articulated his consideration of all of J.K.M.'s impairments, including his consideration of the opinion evidence and Teacher Questionnaires, and we find that the decision was supported by substantial evidence.

At the outset, we note that many of the impairments argued by the plaintiff to be severe were not diagnosed in his medical records. Indeed, the plaintiff has not cited to, and we have not found evidence in the record that J.K.M. was diagnosed by any medical provider with insomnia, hypersomnia, oppositional defiant disorder, obsessive compulsive disorder, Asperger's Syndrome, and learning disorder. While some treatment notes reference J.K.M.'s trouble sleeping, it is further noted that he was taking medications for his sleep issues and that they were working well. Moreover, it is well settled that "the mere existence of a diagnosis does not equate to a severe impairment." Williamson v. Kijakazi, 2022 WL 3716944, at *1 n.1 (W.D. Pa. Aug. 29, 2022) (citing Phillips v. Barnhart, 91 F. App'x 775, 780 (3d Cir. 2004)). Accordingly, we cannot conclude that the ALJ erred when he did not consider these impairments, which were not diagnosed, severe at Step 2 of the analysis.

Further, we conclude that the ALJ's discussion of J.K.M.'s severe impairments is supported by substantial evidence. On this score, the ALJ found J.K.M.'s panhypopituitarism, obesity, ADHD, autism, generalized anxiety disorder,

and mood dysregulation disorder to be severe impairments, as they caused more than minimal functional limitations. However, after consideration of the medical evidence, the opinion evidence, the Teacher Questionnaires, and the testimony elicited from J.K.M. and his mother, the ALJ found that these impairments did not meet, medically equal, or functionally equal a listed impairment.

In the ALJ's discussion regarding the domain of acquiring and using information, the ALJ noted that Ms. Shearer testified that her son had a limited ability to progress, learn, and understand. However, the ALJ noted that the Teacher Questionnaire stated that J.K.M.'s actual grade level was 8, and that he received supplemental support. He further noted that the teacher indicated that J.K.M. had no more than obvious problems in this domain, as he had some difficulty with certain school subjects. Further, the ALJ noted that J.K.M.'s school report cards for the 2017-2018 and 2018-2019 school years showed relatively good final grades. Finally, the ALJ indicated that these findings were consistent with the opinions of the state agency consultants, who opined that J.K.M. had less than a marked limitation in this domain.

When discussing J.K.M.'s less than marked limitation in attending and completing tasks, the ALJ considered Ms. Shearer's statements that J.K.M.'s ability to pay attention and stay on task is limited. However, the ALJ noted that the Teacher

Questionnaires indicated two serious problems in this domain, but no more than obvious problems in the remaining areas, and that J.K.M.'s 2019-2020 report card showed passing final grades. With respect to his less than marked limitation in interacting with others, the ALJ noted that Ms. Shearer's testimony, the Teacher Questionnaires, and the consulting opinion evidence supported this less than marked limitation. On this score, the ALJ noted that Ms. Shearer testified that J.K.M. generally gets along with his siblings and schoolteachers, and that the Teacher Questionnaires noted no more than obvious problems in this area. The ALJ further noted that the state agency consulting opinions supported this limitation.

Finally, with respect to the ALJ's finding that J.K.M. had less than marked limitations in caring for himself and in health and physical well-being, the ALJ similarly discussed Ms. Shearer's testimony and the Teacher Questionnaires, as well as the medical evidence. On this score, the ALJ noted that both Ms. Shearer and Ms. Derr had concerns about J.K.M.'s personal hygiene. However, Ms. Derr indicated that J.K.M. otherwise had no problems caring for his physical needs and using good judgment. The ALJ did note that J.K.M. had some issues staying on task and with avoidant behaviors. With respect to physical well-being, the ALJ recounted the medical evidence which indicated that J.K.M.'s pituitary impairment was well controlled on his medications. Ms. Derr noted no areas of concern in this domain.

Further, the ALJ noted that while one state agency consultant opined that J.K.M. had no limitation in this domain, after consideration of the other state agency opinions, the Teacher Questionnaires, and the subjective testimony, the ALJ found that J.K.M. had a less than marked limitation in this area.

Accordingly, we cannot conclude that the ALJ erred in his consideration of the evidence. Contrary to the plaintiff's argument, the ALJ did consider the Teacher Questionnaires, which the ALJ found to be consistent with the state agency opinions which found that J.K.M. had less than marked limitations in the domains of functioning and with the treatment records as a whole. The ALJ considered the testimony of J.K.M. and his mother but found that it was not entirely consistent with the medical evidence and opinion evidence of record.

At bottom, it appears that the plaintiff is requesting that this court re-weigh the medical evidence and subjective testimony. This we may not do. See Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 359 (3d Cir. 2011) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) ("Courts are not permitted to re-weigh the evidence or impose their own factual determinations."); see also Gonzalez v. Astrue, 537 F.Supp.2d 644, 657 (D. Del. 2008) ("In determining whether substantial evidence supports the Commissioner's findings, the Court may not undertake a *de novo* review of the Commissioner's decision and may not re-weigh the evidence of

the record.") (internal citations omitted)). Rather, our task is simply to determine whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, Richardson, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce, 487 U.S. at 565. Finding that this deferential standard of review is met here, we conclude that a remand is not appropriate for the purpose of further assessing this opinion evidence.

In sum, on its merits the ALJ's assessment of the evidence in this case complied with the dictates of the law and was supported by substantial evidence. This is all that the law requires, and all that a claimant can demand in a disability proceeding. Thus, notwithstanding the argument that this evidence might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.' " Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting Hunter Douglas, Inc. v. NLRB, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security

disability determinations, we find that substantial evidence supported the ALJ's evaluation of this case and recommend that this decision be affirmed.

## IV.  <u>Conclusion</u>

For the foregoing reasons, the final decision of the Commissioner will be affirmed.

An appropriate order follows.

Submitted this  16th day of November 2022.

*/S/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge
